J-A04009-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| MARK GOLDMAN, | |
| Appellee | No. 3822 EDA 2015 |

Appeal from the Order December 1, 2015
In the Court of Common Pleas of Bucks County
Criminal Division at No(s): CP-09-CR-0007567-2015

BEFORE: SHOGAN, SOLANO, and PLATT,[*] JJ.

MEMORANDUM BY SHOGAN, J.: **FILED SEPTEMBER 18, 2017**

The Commonwealth appeals from the order dismissing all charges filed against Appellee, Mark Goldman, a private investigator who has performed work for the Risoldi family. We affirm.

Over the course of several decades, the Risoldi family experienced multiple fires in their residences, resulting in the filing of numerous claims to various insurance companies. Ultimately, these claims led to criminal charges being filed against various members of the Risoldi family. The trial court set forth a more detailed history of this matter as follows:

> While the fire of October 22, 2013, is the central theme of the charges against the defendants, that fire must be viewed in a broader context because of the Commonwealth's theory of the

---

[*] Retired Senior Judge assigned to the Superior Court.

case[1]. The Commonwealth contends that Claire Risoldi has engaged in a multi-year course of conduct intended to defraud the insurers of residences she owned/occupied and that she used the funds received from those insurers to fund her lifestyle which the Commonwealth characterized as "extravagant." Accordingly, it is necessary to reference earlier claims in order to follow the various strands of evidence that the Commonwealth sought to weave together to support the charges on which she and the other defendants were held for court.

[1] The District Attorney of Bucks County requested that the Office of the Pennsylvania Attorney General handle this case. When [this court] use[s] the term Commonwealth, [it] mean[s] the Office of the Attorney General.

\* \* \*

An additional caveat is necessary and that is that the Commonwealth agrees that the pre[-]2013 matters are to be considered as evidence against Claire Risoldi, hereinafter Claire, only. For ease of reference, Carlo Risoldi, her son, is hereinafter referred to as Carl.

The Claim of November 29, 1984

The Risoldi family,[2] lived [on] Tower Circle, Yardley, PA. On November 29, 1984, their home was burglarized and items were reported taken, including jewelry. The insurer was Chubb Insurance Company. A claim was submitted for jewelry the family (father and Claire) said was taken and Chubb reimbursed them $120,324 for the jewelry.

[2] Carlo (father)[,] Claire, Carl[,] and Carla[.]

The Claim of December 16, 1993

The Risoldis (father, Claire, Carl and Carla) still resided at the . . . Tower Circle address. The house was broken into, vandalized and items reported taken. The insurer was Nationwide Insurance Company. Among the items reported taken were pieces of jewelry. The Risoldis (father & Claire) claimed losses of $363,478. Their claim was settled for $80,000 following institution of a lawsuit against Nationwide.

In her [examination under oath], given in support of the claim, Claire stated that her husband was presently disabled but had earned $75-80,000 per year as a foreman/supervisor for a tile company. She further stated her husband received another $50,000-$60,000 per year from "other investments".

Her first husband's income features prominently in the Commonwealth's theory as it suggests there was insufficient income to sustain the lifestyle the family enjoyed and the jewelry Claire claimed to own. She also stated that all her scheduled jewelry was taken. The scheduled jewelry was valued at $111,000.

## The Claim of April 22, 2002

As of this date, the Risoldis (Claire, Carl and Carl's wife, Sheila) lived [on] Stoney Hill Road, hereinafter referred to as Clairemont. The record does not indicate when Carl, the father, died or what estate, if any, he left.

On April 22, 2002, a "home invasion" occurred at Clairemont while Sheila was in the house. Again, jewelry was listed as being taken. The value of the scheduled[3] jewelry was $131,827. The insurer was Fireman's Fund Insurance Company. A claim was filed for $449,018 and settled for $206,888 which included the entire amount for scheduled jewelry, $131,827.

[3] Scheduled means insurance coverage exists for the items.

## The Claim of June 17, 2009

On June 17, 2009, a fire occurred in a room that Claire used for dressing and personal care purposes. She was in an adjacent room when she heard a sound and smelled smoke. The insurer at this time was American International Group, hereinafter AIG. This fire occurred on the second floor of Clairemont and caused structural damage, etc. One of the items damaged was drapery which AIG believed could be cleaned but Claire insisted be replaced. A Commonwealth theme is Claire's ability to dominate others and to get them to act as she wishes. As a result of her demand, AIG paid $300,000 to replace the drapes. Drapes are another thread in the web the Commonwealth wove to charge the defendants.

The fire was investigated, was determined to be accidental and the cause to be electrical. The presence of hair spray in the area of the fire was noted as it can be an accelerant. Hair spray is another common theme in the various fires. However, [the trial court] take[s] judicial notice that hair spray is commonly found in areas where women dress. On the other hand, multiple cans of hairspray are unusual, especially when stored in the attic.

At the time of this incident Carl was the named insured. Carl and AIG disagreed as to the amount of the loss and ultimately the claim settled for $1,800,000.

### The Claim of August 16, 2010

On August 16, 2010, a fire occurred in an attic dormer at Clairemont. Access to the attic was through a set of pull down stairs and hoses, etc. had to be pulled through the house to the attic. There was extensive structural damage, as well as smoke and water damage. Outside consultants were brought in to determine the cause of the fire, extent of damage, etc. The local Fire Marshall also conducted an examination to determine the cause of the fire. Cases of hair spray were found in the attic near where the fire started. Once again, the fire was ruled accidental with the cause being electrical.

AIG was the insurer. Claire asserted that she had replaced the drapes damaged in the 2009 fire at a cost of $1,200,000 and submitted a claim for same. When the parties were unable to agree to the actual loss, the claim settled for $8,000,000 which sum included $1,200,000 for the drapes which [the trial court has] already noted are a thread in the Commonwealth's case.

As part of the restoration work following this fire murals were painted on the entrance hall ceiling and dining room wall by Russell Buckingham who testified that he had been paid a total of $50,000 for both murals. The cost of these murals is another thread in the Commonwealth's web.

AIG also provided funds to the Risoldis (Claire, Carl and Sheila) for substitute housing while Clairemont was being repaired. This type [of] coverage was referred to as ALE (alternative living expenses) and it too becomes a thread in the Commonwealth's web.

## The Claim of October 22, 2013

At the time of this claim[4] Claire, her then husband Tom French, Carl, Sheila and their children resided at Clairemont. Carla lived elsewhere with her family. Clairemont, at the time of this fire, was owned by Carl and Carla.

[4]  The Commonwealth contends that the conduct surrounding this claim is attributable to all defendants and supports the corrupt organization counts against them.

AIG insured Clairemont and provided the following coverages:

1.  dwelling coverage on the home
2.  structure coverage for out buildings, e.g., pool, garages
3.  contents/personal property
4.  alternative living expenses
5.  guaranteed replacement cost

The named insureds were Carl and Sheila and although Claire was not a named insured, she was covered under the policy. There was also a COLLECTIONS POLICY with Carl and Sheila as the named insureds. Coverage was for eleven million dollars. The policy also covered Claire's jewelry.

According to Mr. O'Keefe, AIG's adjuster, the drapes, ceiling and wall murals (a claim for more than $800,000 was made to redo the murals[)], fall under the dwelling coverage. The insurance policy/policies were never offered into evidence and [the trial court does] not know if Mr. O'Keefe's interpretation is correct. However, at this stage of the proceedings, [the trial court] accept[s] his interpretation as a correct statement of the policy.

This fire began about 1:00 pm in an attic dormer and was so extensive as to result in Clairemont being declared a total loss by AIG. AIG paid the full policy coverage for the structure, $7,200,000, as all the PRIVATE experts who looked into the cause of the fire concluded it was accidental.[5] However, as Carl and Sheila had replacement coverage, AIG was obligated to pay

the actual cost of replacing Clairemont, a sum much greater than the $7,200,000 dwelling coverage.

[5] There are three categories for a fire:
    (1)   Accidental - meaning it was accidental
    (2)   Incendiary - meaning it was caused by someone putting a fire where one is not supposed to be, and
    (3)   Undetermined - meaning the investigator is unable to determine if the fire was accidental or incendiary.

FIRE MARSHALL KETTLER, UNLIKE THE HIRED EXPERTS LISTED THE FIRE CAUSE AS UNDETERMINED. He also listed the two earlier fires as undetermined.

AIG agreed that it would take three years to rebuild Clairemont and paid for the rental of two houses, one for Carl and his family and one for Claire and Tom French. AIG made lump sum payments as requested by Claire and Carl. These payments are a thread in the Commonwealth's web as it contends that the actual lease payment on Claire's residence was less than stated and that she used the money to buy the house through a straw party. Mr. O'Keefe testified that the purchase of the homes by Claire through a straw party and by Carl directly were not an "appropriate use" of ALE funds and that they should have notified AIG of these transactions. Again, in the absence of the exact language of the policies, Mr. O'Keefe's comments are, at this stage, accepted as correct.

As this was the third fire at Clairemont in four years, the antennae of the police and fire personnel responding were on high alert. Officer Johnson of the Buckingham Township Police arrived within minutes of the fire being reported and assisted the firemen on scene by kicking down the front door to enable them to gain access to Clairemont. When Claire arrived and fainted he checked to see if the faint, "was real or fake." Lieutenant Landis of the Buckingham Township police, a long-time friend of the Risoldi family, also responded to the fire. He told Claire that she would be subject to tough questioning because of the three fires at the residence. Indeed, Fire Marshall Kettler[6], asked Carl the

- 6 -

day of the fire if his mother, Claire, could have been involved in the origin or cause of the fire. The Commonwealth presented this testimony to set the stage for its position that the family's failure to note the presence of the jewelry to the authorities was part of their scheme to defraud AIG. The issue of notice regarding the "missing jewelry" is obviously at the heart of this case. The defense notes that Carl sent a text regarding the jewelry to an AIG representative, Mr. Amoroso, on the evening of October 22, 2013. The Commonwealth asserts that the defendant's comments regarding trying to alert officials of the presence of the jewelry and/or their desire to get into Clairemont to retrieve same is evidence of their involvement in a corrupt organization. The defense countered that, Tom French did gain access to Clairemont while the fire was ongoing. He was encountered by Fire Marshall Kettler on the second floor of Clairemont while Kettler was checking to see if anyone was in the house. Interestingly, Mr. French did not state why he was in the house or make mention of the jewelry or the need to get it out.

> [6] Mr. Kettler responded to the three Clairemont fires and noted that as to the 2010 and 2013 fires, no one was at home when they occurred, that there were multiple cases of hairspray in the area of the fire and that Claire was the last to leave home.

All the Risoldis, Claire, Carl, Sheila and Carla were present at some point while the fire was being fought, as was Tom French.

[Appellee] was also present on the day of the fire although the record is unclear whether he was there prior to the fire personnel departing. [Appellee], a licensed private detective, had a long-standing relationship with Claire and Carla and seems to have functioned as an aide to Claire. Regarding the 2013 fire, he was present for many of the meetings Claire and/or Carl had with representatives of AIG, interacted with police officials and delivered documents to AIG on their behalf.

Trial Court Opinion, 9/15/15, at 2-9 (citations omitted).

On December 19, 2014, the Thirty-Fifth Statewide Investigating Grand Jury[1] issued a presentment recommending that charges be filed against Appellee, Claire Risoldi, Carl Risoldi, Carla Risoldi, Sheila Risoldi, Tom French, and Richard Holston in connection with an alleged multi-million dollar insurance fraud scheme. Appellee was charged with one count each of corrupt organizations, theft by deception, attempted theft by deception, criminal conspiracy, obstruction of the administration of law, tampering with records, criminal use of a communication facility, and false reports; two counts each of insurance fraud, dealing in proceeds of unlawful activity, and intimidation of a witness; and three counts of forgery.[2] A preliminary hearing was held before Magisterial District Judge C. Robert Roth from March 30, 2015, through April 7, 2015. At the conclusion of the preliminary hearing, the charges of theft by deception, attempted theft by deception, criminal conspiracy, two counts of insurance fraud, and a single count of forgery were held for court against Appellee. One count of dealing in

---

[1]  As previously indicated, after the Bucks County District Attorney determined he had a conflict of interest, the matter was referred to the Office of Attorney General. We also note that, due to the prominence of the Risoldi family in Bucks County politics, the entire Bucks County Court of Common Pleas recused itself from the matter, and Senior Judge Thomas G. Gavin of Chester County was appointed.

[2]  18 Pa.C.S. §§ 911, 3922(a)(1), 901, 903, 5101, 4104, 7512, 4906, 4117(a)(2), 5111(a)(1)(2), 4952, and 4101(a)(1)(2)(3), respectively.

proceeds of unlawful activity was withdrawn and the remaining charges were dismissed.

On June 15, 2015, Appellee and several of his co-defendants filed petitions for writ of *habeas corpus*. On July 17, 2015, a hearing was held on the petitions before Judge Gavin, and on September 15, 2015, Judge Gavin granted *habeas* relief and dismissed all charges against Appellee. The *habeas* petitions filed by Appellee's co-defendants were denied.

On October 9, 2015, the Commonwealth refiled charges against Appellee, which included corrupt organizations, as well as the charges that had originally been held for court by Judge Roth. The Commonwealth also filed new charges against Appellee and co-defendant Claire Risoldi, including intimidation of a witness, criminal conspiracy, and obstructing the administration of law.[3] The trial court held a preliminary hearing on all of the charges on November 20, 2015. On December 1, 2015, Judge Gavin dismissed all charges that had been filed against Appellee. The Commonwealth filed this timely appeal. Both the Commonwealth and the trial court have complied with Pa.R.A.P. 1925.

The Commonwealth presents the following issue for our review:

I. WHETHER THE LOWER COURT'S DISMISSAL OF CHARGES WAS A MANIFEST ABUSE OF DISCRETION WHERE THE COMMONWEALTH ESTABLISHED A *PRIMA FACIE* CASE FOR ALL CHARGES AND THE COURT'S RESOLUTION WAS CONTRARY TO

---

[3] 18 Pa.C.S. §§ 4952(a)(2), 903, and 5101, respectively.

THE STANDARDS FOR ANALYIZING [sic] SUFFICIENCY OF EVIDENCE TO SUPPORT A *PRIMA FACIE* CASE?

Commonwealth's Brief at 4.[4]  Thus, the Commonwealth contends that the trial court's order dismissing all charges was in error because the Commonwealth allegedly presented sufficient evidence to establish a *prima facie* case for each of the offenses dismissed.

_____

[4]  We observe that, excluding tables and appendices, the Commonwealth's brief is sixty-nine pages long.  Pursuant to Pa.R.A.P. 2135, a principal brief is limited to 14,000 words, and when the brief exceeds thirty pages, the appellant must certify with the appellate court that the brief complies with the word limitation.  **See** Pa.R.A.P. 2135(d) (stating that "[a]ny brief in excess of the stated page limits shall include a certification that the brief complies with the word count limits").  A review of the Superior Court docket reflects that the Commonwealth requested and was granted two extensions of time to file its appellate brief in this matter.  On June 23, 2016, this Court entered an order granting the Commonwealth's second request.  Specifically, the order directed that the Commonwealth's brief shall be filed on or before August 1, 2016, and that no further extensions of time would be granted absent extraordinary circumstances.  Order, 6/23/16, at 1.  Subsequently, on Friday, July 29, 2016, the Commonwealth filed an application for leave to exceed the word limit set forth at Pa.R.A.P. 2135, indicating that its appellate brief was just short of 16,000 words.  Then, on Monday, August 1, 2016, before this Court could act on the Commonwealth's application, the Commonwealth filed its appellate brief, which included a certification that the word count for the entire document is 15,888 words.  Thereafter, on August 18, 2016, this Court entered a *per curiam* order granting the Commonwealth's application and directing that the brief shall not exceed 16,000 words in length.  Order, 8/18/16, at 1.  Because the Commonwealth was permitted by order of this Court to exceed the word limitation of Pa.R.A.P. 2135, albeit in an order entered after the Commonwealth's brief was filed, we shall not dismiss the brief or quash the appeal.  However, we caution counsel for the Commonwealth that we will not hesitate to quash an appeal for violation of Pa.R.A.P. 2135.  **Cf. Commonwealth v. Spuck**, 86 A.3d 870 (Pa. Super. 2014) (finding issues to be waived and quashing appeal where Appellant violated various Rules of Appellate Procedure, including Pa.R.A.P. 2135).

The evidentiary sufficiency, or lack thereof, of the Commonwealth's *prima facie* case for a charged crime is a question of law; this Court's review is plenary. **Commonwealth v. Karetny**, 880 A.2d 505, 513 (Pa. 2005) (citing **Commonwealth v. Huggins**, 836 A.2d 862 (Pa. 2003)). Indeed, the trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its pretrial, *prima facie* burden to establish the elements of a charged crime. **Id**.

In **Huggins**, our Supreme Court explained:

> At the pre-trial stage of a criminal prosecution, it is not necessary for the Commonwealth to prove the defendant's guilt beyond a reasonable doubt, but rather, its burden is merely to put forth a *prima facie* case of the defendant's guilt. A *prima facie* case exists when the Commonwealth produces evidence of each of the material elements of the crime charged and establishes sufficient probable cause to warrant the belief that the accused committed the offense. The evidence need only be such that, if presented at trial and accepted as true, the judge would be warranted in permitting the case to go to the jury. Moreover, "[i]nferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case."

**Id**. at 866 (citations omitted).

However, we have also noted that "suspicion and conjecture are not evidence and are unacceptable as such." **Commonwealth v. Packard**, 767 A.2d 1068, 1071 (Pa. Super. 2001). "[W]here the Commonwealth's case relies solely upon a **tenuous inference** to establish a material element of the charge, it has failed to meet its burden of showing that the crime

- 11 -

charged was committed." ***Commonwealth v. Wojdak***, 466 A.2d 991, 997 (Pa. 1983) (emphasis in original).

INSURANCE FRAUD (Window Treatments)

The Commonwealth first argues that the trial court erred in determining that it failed to present sufficient evidence to support a *prima facie* finding that Appellee committed the crime of insurance fraud. Commonwealth's Brief at 12-44. The Commonwealth contends that it offered sufficient evidence to support the two charges of insurance fraud. Specifically, the charges of insurance fraud were related to the claim presented to AIG for the fire at Clairemont that occurred on October 22, 2013, which was the third fire at Clairemont. The first charge pertained to the insurance claim to replace window treatments. The second charge pertained to the alleged theft of jewelry purportedly valued at more than ten million dollars.

The Crimes Code defines insurance fraud, in relevant part, as follows:

**§ 4117. Insurance fraud.**

**(a) Offense defined. -** A person commits an offense if the person does any of the following:

* * *

(2) **Knowingly and with the intent to defraud** any insurer or self-insured, presents or causes to be presented to any insurer or self-insured any statement forming a part of, or in support of, a claim that contains any false, incomplete or misleading information concerning any fact or thing material to the claim.

18 Pa.C.S. § 4117(a)(2) (emphasis added). In addition, the statute defines the term "statement," in part, as "[a]ny oral or written presentation or other evidence of loss, injury or expense, including, but not limited to, any notice, statement, proof of loss, bill of lading, receipt for payment, invoice, account, estimate of property damages, bill for services, . . . or computer-generated documents." 18 Pa.C.S. § 4117(l)

Initially, the Commonwealth addresses the charge related to the insurance claim for replacement of the window treatments at Clairemont. Commonwealth's Brief at 13-26. The Commonwealth asserts that Appellee provided AIG with fabricated documents in an effort to establish that the window treatments had been replaced following the second fire, thereby supporting the insurance claim pertaining to the window treatments after the third fire.

It is undisputed that, absent documentation that the window treatments had been replaced following the second fire at Clairemont, AIG refused to pay the insurance claim related to the window treatments after the third fire. Moreover, it is undisputed that Appellee delivered a binder to AIG that contained documents purportedly relating to the window treatments in question.

However, the Commonwealth presented no evidence that Appellee, who was employed by the Risoldis, knew that the documents contained in the binder he delivered to AIG on behalf of the Risoldis contained any false,

incomplete or misleading information as required under the statute. Evidence of the requisite knowledge cannot be inferred from our reading of the certified record. Rather, as the trial court stated, "The testimony read in the light most favorable to the Commonwealth indicates that [Appellee] functioned as a documents courier and/or a '[gopher]' who was tasked to do certain things by Claire and did so." Trial Court Opinion, 9/15/15, at 17-18. Thus, while Appellee may have given a statement in the form of documents in a binder that "contains . . . false, incomplete or misleading information concerning any fact or thing material to the claim," there is no showing that this statement was made with any intent on the part of Appellee to defraud the insurer. Therefore, even if the alleged misstatements contained in the binder were found to be material to the insurance claim, as alleged by the Commonwealth, there is no evidence that Appellee had any knowledge of what exactly was contained within the binder. Moreover, there is nothing in the record that indicates that, in delivering the binder to AIG, Appellee was attempting to collect any money from the insurer. Hence, we are left to conclude, as did the trial court, that Appellee simply was the courier of the binder and did not have the necessary *mens rea* to acquire anything from the insurer. Thus, the Commonwealth's claim fails.

## INSURANCE FRAUD (Jewelry)

The Commonwealth next argues that it presented a *prima facie* case to support the charge of insurance fraud related to the insurance claim for

jewelry that supposedly went missing during the fire. Commonwealth's Brief at 26-44. After the third fire, the Risoldis made a claim in excess of ten million dollars for allegedly stolen jewelry, which was denied by AIG. N.T., 4/7/15, at 1839-1840. The Commonwealth contends that in three instances Appellee offered testimony in an examination under oath related to the jewelry claim that was designed to defraud AIG. Specifically, the Commonwealth makes the following assertion to support its argument:

> [Appellee's] testimony in the [examination under oath] claimed (1) that Lieutenant Landis confirmed *to* [*Appellee*] that Claire Risoldi told Landis about the jewelry during the fire, (2) that [*Appellee*] *heard* Anthony Amoroso tell Claire Risoldi not to file a police report and (3) that Lieutenant Landis *told* [*Appellee*] not to file a police report. These statements by [Appellee] were material, patently false and designed to defraud AIG.

Commonwealth's Brief at 27 (emphases in original).

Our thorough review of the record reflects that, in an examination under oath, Appellee offered the following testimony regarding his discussion with Lieutenant Landis concerning Claire addressing the jewelry with Lieutenant Landis during the fire:

> I also spoke with [Lieutenant Landis] about the day of the fire. And [Lieutenant Landis] confirmed to me that Claire was going on and on about her missing jewelry in the driveway -- excuse me, not the missing jewelry, the bags of jewelry in the foyer and she needed to get into the foyer. And she asked him to go into the foyer for her and get the bags. [Lieutenant Landis] confirmed that to me on that date.
>
> Question: When did he confirm that to you?

Answer:    The evening on the 23rd when he came out to do security.  He was the first officer out that day -- that evening, approximately seven thirty or eight o'clock in the evening.

Question:  When last have you communicated with [Lieutenant] Landis?

Answer:    We spoke via telephone some time in maybe November, maybe it was December, when I contacted him and asked him to write me a letter confirming that he -- that Claire had asked him about the jewelry and mentioned jewelry to him the day of the fire about going to get the bags.  That was the last time I spoke with him over the telephone.

Question:  Well, what happened when you asked him to write a corroborating statement?

Answer:  He said he was not permitted to write anything.

N.T., 4/7/15, at 1887-1888.

In addition, the record reflects that Appellee made the following statements under oath concerning comments from Anthony Amoroso, AIG's first insurance adjuster assigned to the claim, regarding the filing of a police report for the missing jewelry:

Now Claire was told by Anthony Amoroso a day after the fire and I was there when he said it and I overheard him saying it -- he was the original insurance adjuster on the job -- do not make a formal claim with your local Police Department until you know for sure that the jewelry is not in the house.

[Claire's husband] found the two bags, but then subsequently he was finding other loose pieces around. Another tennis bracelet was found by one of the workers about a week or so later. So jewelry was being found. So until we knew, until they cleared out the house --

* * *

- 16 -

So until they knew, until they cleared out the house and took everything out of the house and thoroughly checked everywhere, all the nooks and crannies of the house, they were told not to file a Police Report, not to file a fraudulent report by the insurance adjuster. I heard him say that.

* * *

I did not contact the local police because I was told not to. Because the insurance adjuster told them not to file a false report.

N.T., 4/7/15, at 1884-1885.

Appellee also offered the following testimony:

Question: . . . Your contention is that you didn't go to the local police immediately because you were acting on instructions from AIG; is that right?

Answer: I wasn't acting on instructions.

Question: Well, your client was acting on instructions?

Answer: I heard the adjuster, Anthony Amoroso, tell Claire to not file a false Police Report until you know. Do not file a Police Report until you know exactly and you're one hundred percent sure that the jewelry is not in that house. Do not file a fraudulent Police Report.

*Id*. at 1888-1889.

Our careful review of the certified record reflects that the Commonwealth has misrepresented Appellee's statements by insinuating "that Lieutenant Landis *told* [*Appellee*] not to file a police report." Commonwealth's Brief at 27 (emphasis in original). **See also** Commonwealth's Brief at 39 (stating that "[a]mple evidence also demonstrated that [Appellee] claimed Lieutenant Landis *told him* not to file a

police report") (emphasis in original). Interestingly, in its argument, the Commonwealth has failed to cite to any portion in the record to support a claim that Appellee specifically stated that Lieutenant Landis told him not to file a police report concerning the missing jewelry. Indeed, our review reflects that such statements attributable to Appellee under oath are not present in the record before us. Accordingly, we will ignore any argument offered by the Commonwealth to the contrary.[5]

Regardless of whether these statements actually were false, as alleged by the Commonwealth, we are left to conclude that the Commonwealth has failed to establish a *prima facie* case that Appellee made the statements with

_____

[5] We note that our reading of the certified record does reflect the following testimony from Appellee under oath:

> One thing we discussed, [Lieutenant Landis] cautioned me to caution Claire not to publicly scream or holler and say that she felt that the firefighters were responsible for this theft.
>
> Number one, she lives in the area and they may not come out and fight one of her fires again. Number two, the firefighters and the police are like brothers.
>
> And [Lieutenant Landis] after -- after Claire had mentioned this in public the previous day in front of the fire marshal, and in front of the other people, it got around. And [Lieutenant Landis] was having a tough time getting officers to come out and do the night shift patrol -- the night shift security because they were upset with Claire that she was insinuating that the firefighters may have something to do with this.

N.T., 4/7/15, at 1886-1887. However, these statements attributable to Appellee do not establish that he claimed Lieutenant Landis specifically told him not to file a police report regarding the missing jewelry.

the intent to defraud the insurer. As previously noted, nothing in the record supports the suggestion that Appellee had the necessary *mens rea* to acquire anything from the insurer. Hence, the Commonwealth's claim fails.

THEFT BY DECEPTION

The Commonwealth next argues that the trial court erred in determining that it failed to present a *prima facie* case that Appellee committed the crime of theft by deception. Commonwealth's Brief at 44-45. In this regard, the Commonwealth contends the following:

> It is the Commonwealth's position that, under the same reasoning that a *prima facie* case was established for insurance fraud, this count of theft by deception related to the jewelry claim was supported by sufficient evidence to establish a *prima facie* case. [Appellee's] multiple false statements as outlined above establish that he intentionally created a false impression to AIG in an attempt to obtain insurance payments in excess of $10 million.

Commonwealth's Brief at 45.

The crime of theft by deception is defined as follows:

**§ 3922. Theft by deception.**

**(a)  Offense defined.** — A person is guilty of theft if he intentionally obtains or withholds property of another by deception. A person deceives if he intentionally:

> (1)   creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind; but deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise[.]

18 Pa.C.S. § 3922(a)(1). "The *mens rea* for theft by deception is intent to defraud." **Commonwealth v. Grife**, 664 A.2d 116, 120 (Pa. Super. 1993).

In addition, this Court observed in **Commonwealth v. Grife**, 664 A.2d 116 (Pa. Super. 1995):

> A man is defrauded if, by intentionally false representations of fact he has been induced to make a donation, or has been induced to pay money or to deliver property upon receipt of something quite different from what he understood he was getting or has been induced to lend money upon the strength of security which is not what it is represented to be.

**Id**. at 120 (quoting **Rosengarten v. State**, 171 So.2d 591, 595 (Fla. App. 1965)) (original emphasis omitted).

Our review of the certified record reflects that AIG did not dispense any insurance proceeds on the jewelry claim. James O'Keefe, a general adjuster with AIG who was assigned to the claims related to the 2013 fire at Clairemont, testified as follows regarding the jewelry claim:

Q  Did AIG pay this claim for the stolen jewelry?

A  No.  We have disclaimed and denied coverage for this loss.

Q  Did you issue a denial letter?

A  Yes.

N.T., 4/7/15, at 1840.  This fact was alluded to by the Commonwealth when it stated that Appellee "intentionally created a false impression to AIG in an **attempt to obtain** insurance payments . . . ."  Commonwealth's Brief at 46 (emphasis added).  Thus, it is evident that no property was obtained from AIG with regard to the jewelry claim.  Accordingly, the Commonwealth's

assertion that it presented a *prima facie* case that Appellee committed the crime of theft by deception lacks merit.

<u>CRIMINAL ATTEMPT TO COMMIT THEFT BY DECEPTION</u>

The Commonwealth next argues that the trial court erred in determining that it failed to present a *prima facie* case that Appellee committed the crime of criminal attempt to commit theft by deception. Commonwealth's Brief at 45-46. The Commonwealth states the following:

> It is the Commonwealth's position that under the same reasoning that a *prima facie* case was established for insurance fraud, this count of criminal attempt at theft by deception related to the jewelry claim was supported by sufficient evidence to establish a *prima facie* case. [Appellee's] multiple false statements as outlined above establish that he intentionally created a false impression to AIG in an attempt to obtain insurance payments in excess of $10 million.

***Id***.

"A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S. § 901(a). "Our Crimes Code is clear in defining the two (2) elements of the offense of attempt by providing: (1) that the actor intend to commit an offense; and (2) that the actor take a substantial step toward completion of the offense." ***Commonwealth v. Henley***, 474 A.2d 1115, 1118 (Pa. 1984). To obtain a conviction for attempted theft by deception, the Commonwealth is required to prove only that the defendant intended to deceive the victim and took a substantial step

toward that end.  ***Commonwealth v. Imes***, 623 A.2d 859, 862-863 (Pa. Super. 1993).  As our Supreme Court has long observed:

> An attempt, in general, is an overt act done in pursuance of an intent to do a specific thing, tending to the end but falling short of complete accomplishment of it.  In law, the definition must have this further qualification, that the overt act must be sufficiently proximate to the intended crime to form one of the natural series of acts which the intent requires for its full execution.  So long as the acts are confined to preparation only, and can be abandoned before any transgression of the law or of others' rights, they are within the sphere of intent and do not amount to attempts.

***Commonwealth v. Wojdak***, 466 A.2d 991, 1001 (Pa. 1983) (quoting ***Commonwealth v. Eagan***, 42 A. 374, 377 (Pa. 1899)) (emphasis omitted).

As previously discussed, our review of the record reflects that Appellee made statements under oath pertaining to Claire Risoldi's concern for the jewelry left inside of the home during the fire and her behavior in front of Lieutenant Landis during the fire.  These statements were controverted by testimony from Lieutenant Landis.  However, there is no evidence of record that Appellee made the statements about Claire and the jewelry with the intent to commit the crime of insurance fraud.

In addition, as mentioned above, Appellee offered testimony regarding AIG insurance adjuster Anthony Amoroso's suggestion that a police report regarding the jewelry be filed only after there was complete certainty that the jewelry was not in the house so that a fraudulent police report was not filed.  These statements were not directly controverted by Mr. Amoroso.

Rather, our review reflects Mr. Amoroso offered the following innocuous testimony regarding the reporting of missing jewelry to the police:

Q Did you tell them that if jewelry was missing they should not report it to the police immediately?

A I never said that, no.

Q Would that be consistent with your practice and general insurance industry practice to tell someone who suffered a theft loss to delay reporting it to the police?

A The policy, as a condition, if there is any theft of any jewelry, anything in the home, or a mysterious disappearance, it needs to be reported to the police and we need a Police Report.

N.T., 4/1/15, at 792. This testimony does not refute the testimony offered by Appellee indicating that the delay in filing a police report was due to Mr. Amoroso warning Claire to be certain of what jewelry was missing in order to avoid the filing of a false police report. Accordingly, we fail to see how Appellee's testimony regarding the timing of the filing of a police report was offered with the intent to deceive AIG into paying the insurance claim. Hence, we discern no error on the part of the trial court in concluding that the Commonwealth failed to present a *prima facie* case that Appellee committed the crime of attempted theft by deception.

CRIMINAL CONSPIRACY

The Commonwealth next argues that the trial court erred in concluding that the Commonwealth failed to establish a *prima facie* case that Appellee committed the crime of criminal conspiracy. Commonwealth's Brief at 46-56. The Commonwealth asserts that Appellee "personally delivered the

altered and forged documents knowing full well their significance and he lied under oath in an effort to bolster the false Risoldi claims." *Id*. at 46. The Commonwealth points out that the trial court determined that a *prima facie* case was established against the members of the Risoldi family on the corrupt organizations charge and the conspiracy charge based, in part, on some of the family members "parroting the party line" with regard to the allegedly missing jewelry. *Id*. at 50. Thus, the Commonwealth ultimately alleges Appellee's similar assertions under oath regarding the jewelry, coupled with "conduct [that] encompassed far more than being a 'go-fer' who 'parroted the party line'" demonstrate his participation in the conspiracy. *Id*. at 55. In essence, the Commonwealth contends that Appellee "played an active role in the Risoldi scheme to defraud AIG." *Id*. at 51.

The crime of criminal conspiracy is set forth in Section 903 of the Crimes Code providing, in relevant part, as follows:

**§ 903. Criminal conspiracy.**

**(a) Definition of conspiracy. —** A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

**(b)  Scope of conspiratorial relationship.** — If a person guilty of conspiracy, as defined by subsection (a) of this section, knows that a person with whom he conspires to commit a crime has conspired with another person or persons to commit the same crime, he is guilty of conspiring with such other person or persons, to commit such crime whether or not he knows their identity.

**(c)  Conspiracy with multiple criminal objectives.** — If a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship.

\* \* \*

**(e) Overt act.** — No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S. § 903.

Furthermore, we have explained the following:

A conviction for criminal conspiracy, 18 Pa.C.S.A. § 903, is sustained where the Commonwealth establishes that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy.

The essence of a criminal conspiracy is the common understanding that a particular criminal objective is to be accomplished.  Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient.  Rather, the Commonwealth must prove that the defendant shared the criminal intent, *i.e.,* that the Appellant was "an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement."  The defendant does not need to commit the overt act; a co-conspirator may commit the overt act.

A conspiracy is almost always proven through circumstantial evidence.  "The conduct of the parties and the

circumstances surrounding their conduct may create 'a web of evidence' linking the accused to the alleged conspiracy beyond a reasonable doubt." The evidence must, however, "rise above mere suspicion or possibility of guilty collusion."

> Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa. Super. 2002) (*en banc*) (citations omitted).

Our review of the record reflects the trial court held various members of the Risoldi family for court on multiple charges, including charges of conspiracy. Trial Court Opinion, 9/15/15, at 15.[6] However, the trial court

---

[6] In doing so, the trial court adopted its reasoning related to the finding that a *prima facie* case was established against the members of the Risoldi family for corrupt organizations. Trial Court Opinion, 9/15/15, at 9. In finding that Claire and Carl Risoldi should be held for trial, the trial court stated, "evidence was presented that they both pressed claims with AIG for the drapes, mural, jewelry, and [additional living expenses]." *Id*. As to Sheila Risoldi, the trial court noted the fact that she is a family member struck the court as "guilt by association." The trial court then stated, "[Sheila's] involvement . . . is based on her family name, the proof of loss statements she signed, that she stated in her [examination under oath] that she saw the jewelry bags in the hall, and that Claire was trying to get into the house (on the day of the fire) to get the bags of jewelry, i.e., that she was parroting the 'party line' regarding those matters." *Id*. at 10. Regarding Carla

*(Footnote Continued Next Page)*

concluded that there was no such *prima facie* case presented with regard to Appellee. **Id**. at 18-19. We are constrained to agree.

First, we note that Appellee had an association with the Risoldi family because he was employed as a private investigator. In his capacity, he attended multiple meetings and examinations under oath provided by family members.

Second, we observe that there is little, if any, evidence to establish that Appellee had knowledge of the commission of a crime. Specifically, with regard to the Commonwealth's claim that Appellee delivered a binder to AIG containing "altered and forged documents knowing full well their significance," Commonwealth's Brief at 46, our review of the certified record reflects no evidence that Appellee was aware of the authenticity of the materials contained in the binder.

Concerning the Commonwealth's allegations that Appellee lied under oath multiple times, we first consider Appellee's testimony about his conversation with Anthony Amoroso. We observe that Appellee testified that

*(Footnote Continued)* ———————————

Risoldi, the trial court relied upon her family membership, and the fact that she too "parroted the party line" concerning Claire's behavior and concern about the jewelry on the night of the fire. **Id**. In addition, the trial court noted Carla's participation in a telephone call from Claire to a third party, who was scheduled to testify before the investigative grand jury, about a gift of jewelry once "it was all done." **Id**. at 11. The trial court specifically stated that "Carla's participation in this telephone call is telling as she had to be aware that the purpose of the call was to influence the testimony [the third party] would give." **Id**.

Mr. Amoroso suggested that the filing of a police report should be accurate and that the report be made when the family was certain about the missing jewelry so that a fraudulent report was not presented to the police. N.T., 4/7/15, at 1884-1885, 1888-1889. This testimony was not contradicted by Mr. Amoroso.

We next consider Appellee's testimony about his conversation with Lieutenant Landis. We observe that Appellee testified that Lieutenant Landis asked Appellee to caution Claire "not to publicly scream and holler and say that she felt that the firefighters were responsible for [the] theft." N.T., 4/7/15, at 1886. However, Appellee's testimony does not amount to a direction from the lieutenant that a police report should not be filed. Moreover, we note that Lieutenant Landis did not contradict this testimony.

We also consider Appellee's testimony regarding Claire's behavior on the night of the fire. Specifically, Appellee testified about a conversation with Lieutenant Landis in which he spoke about Claire's behavior during the fire and her request that Lieutenant Landis go into the foyer for her and retrieve the bags of jewelry. N.T., 4/7/15, at 1887. Lieutenant Landis refuted this testimony. However, this disputed testimony offered by Appellee, which was supported by other testimony from Risoldi family members, does not necessarily establish an inference that Appellee had knowledge of the commission of a crime.

Third, we consider Appellee's presence at the scene. Again, we note that Appellee was employed by the Risoldi family as a private investigator and was present at various points in time with regard to the insurance claim. However, we note that there was not a specific scene of the crime as contemplated in the factors set forth in **Lambert**. Accordingly, we conclude that this factor is not particularly relevant to our inquiry.

Fourth, we review Appellee's participation in the object of the conspiracy. As mentioned above, Appellee was employed as a private investigator by the Risoldi family. As such, he was present at various points in the family's dealings with AIG. In addition, Appellee gave an examination under oath. It can only be alleged that Appellee's testimony regarding a conversation he had with Lieutenant Landis about Claire's behavior during the fire, which was refuted by Lieutenant Landis, amounts to a participation in the conspiracy. Accordingly, we are left to conclude that this testimony was not sufficient to furnish a web of evidence linking Appellee to an alleged conspiracy. Hence, we conclude that the trial court properly determined that the Commonwealth failed to set forth a *prima facie* case with regard to the charge of criminal conspiracy.

FORGERY

The Commonwealth next argues that the trial court erred in concluding that it failed to establish a *prima facie* case that Appellee committed the

crime of forgery.   Commonwealth's Brief at 56-57.   The Commonwealth

presents the following argument:

> It is the Commonwealth's position that under the same reasoning that a *prima facie* case was established for insurance fraud, this count of forgery related to the fabricated and altered documents submitted to AIG by [Appellee] was supported by sufficient evidence to establish a *prima facie* case.  Accordingly, the lower court erred by dismissing the count.

*Id*. at 57.  We are constrained to disagree.

> The relevant statute regarding forgery provides as follows:
>
> **(a) Offense defined. –** A person is guilty of forgery if, with intent to defraud or injure anyone, or with knowledge that he is facilitating a fraud or injury to be perpetrated by anyone, the actor:
>
>> (1) alters any writing of another without his authority;
>>
>> (2) makes, completes, executes, authenticates, issues or transfers any writing so that it purports to be the act of another who did not authorize that act, or to have been executed at a time or place or in a numbered sequence other than was in fact the case, or to be a copy of an original when no such original existed; or
>>
>> (3) utters any writing which he knows to be forged in a manner specified in paragraphs (1) or (2) of this subsection.
>
> **(b) Definition. –** As used in this section, the word "writing" includes printing or any other method of recording information, money, coins, tokens, stamps, seals, credit cards, badges, trademarks, electronic signatures and other symbols of value, right, privilege, or identification.

18 Pa.C.S. § 4101.

To establish the crime of forgery, the Commonwealth must prove that there was a false writing, that the instrument was capable of deceiving, and that the defendant intended to defraud. **Commonwealth v. Fisher**, 682 A.2d 811, 815 (Pa. Super. 1996) (citing **Commonwealth v. Dietterick**, 631 A.2d 1347, 1352 (Pa. Super. 1993). "By its plain language, the statute requires only that the act be committed with 'intent to defraud or injure', not that the defendant have succeeded in his endeavor." **Commonwealth v. Shamberger**, 788 A.2d 408, 413 (Pa. Super. 2001) (citing **Commonwealth v. Sheaffer**, 23 A.2d 215, 219 (Pa. Super. 1941)). Intent to defraud is an essential element of forgery. **Commonwealth v. Leber**, 802 A.2d 648, 651 (Pa. Super. 2002) (citing **Dietterick**).

As previously discussed, it is undisputed that Appellee delivered to AIG a binder containing documents relevant to the instant insurance claim. However, our review of the record reflects that there is a lack of evidence indicating that Appellee was aware of the particular contents of the binder, or the authenticity of the documents contained therein. Without such evidence, we cannot conclude that Appellee delivered the questionable documents to AIG with an intent to defraud the insurer. Consequently, we must conclude that the Commonwealth failed to present a *prima facie* case of forgery.

<u>CORRUPT ORGANIZATIONS</u>

The Commonwealth next argues that the trial court erred in concluding that it failed to establish a *prima facie* case that Appellee committed the crime of corrupt organizations. Commonwealth's Brief at 57-59. In this regard, the Commonwealth offers the following argument:

> The lower court did not specifically address its reasoning for determining that the Commonwealth failed to establish a *prima facie* case for corrupt organizations against [Appellee]. It is the Commonwealth's position that under the same reasoning that a *prima facie* case was established for insurance fraud and criminal conspiracy discussed above as well as intimidation of witness discussed below, this count of corrupt organizations was supported by sufficient evidence to establish a *prima facie* case. As detailed above and below, [Appellee] was associated with the Risoldi criminal enterprise and directly participated in multiple acts of insurance fraud, theft, intimidation of a witness, obstruction of justice, and forgery.

***Id***. at 58-59.

Regarding corrupt organizations, Section 911 of the Crimes Code provides, in pertinent part, as follows:

> It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

18 Pa.C.S. § 911(b)(3). To sustain a conviction for corrupt organizations, "the Commonwealth must prove that there was an ongoing organization engaged in commerce and that the associates of the organization functioned as a continuing unit...." ***Commonwealth v. Donahue***, 630 A.2d 1238, 1245 (Pa. Super. 1993). This is to "ensure that a criminal defendant is

being convicted based on evidence of his involvement in the ongoing enterprise, as the corrupt organization statute intended, and not merely based on evidence which proves the underlying crimes [were] committed in furtherance of the alleged enterprise." *Id*.

The term "enterprise" is defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." 18 Pa.C.S. § 911(h)(3). "Racketeering activity" is defined to include acts that are indictable under various provisions of the Crimes Code, including Chapter 39 (relating to theft and related offenses), Section 4117 (relating to insurance fraud), and Chapter 49 (relating to falsification and intimidation. 18 Pa.C.S. § 911(h)(1)(i). "Racketeering activity" is also defined to include, *inter alia*, a conspiracy to commit any of the offenses set forth in subparagraph (i). 18 Pa.C.S. § 911(h)(1)(iii). The statute further defines "pattern of racketeering activity" as "a course of conduct requiring two or more acts of racketeering activity one of which occurred after the effective date of this section." 18 Pa.C.S. §911(h)(4).

Our review of the record reveals that Appellee, in his capacity as a private investigator, was employed by the Risoldi family, which the Commonwealth contends was the enterprise in question. However, the Commonwealth has failed to establish that Appellee had knowledge of the

crimes allegedly being committed by the enterprise. Moreover, our review reflects a dearth of evidence that Appellee participated in a pattern, *i.e.*, two or more acts, of racketeering activity. Therefore, we are constrained to agree with the trial court's conclusion that the Commonwealth has failed to set forth a *prima facie* case that Appellee committed the crimes of corrupt organizations.

## INTIMIDATION OF A WITNESS

The Commonwealth also argues that the trial court erred in concluding that it failed to establish a *prima facie* case that Appellee committed the crime of intimidation of a witness. Commonwealth's Brief at 59-66. The Commonwealth contends that, during Appellee's meeting with jewelry appraiser Edward T. Foris at Mr. Foris's home, Appellee "attempted to get [Mr.] Foris to adopt" as his own documents in the form of jewelry appraisals that bore the signature of Mr. Foris, but which Mr. Foris disowned. ***Id***. at 60.

The crime of intimidation of witnesses or victims is codified at 18 Pa.C.S. § 4952 and provides the following pertinent definition of the offense:

> **(a) OFFENSE DEFINED.--** A person commits an offense if, with the intent to or with the knowledge that his conduct will obstruct, impede, impair, prevent or interfere with the administration of criminal justice, he intimidates or attempts to intimidate any witness or victim to:
>
> * * *
>
> (2) Give any false or misleading information or testimony relating to the commission of any crime to

> any law enforcement officer, prosecuting official or judge.

18 Pa.C.S. § 4952(a)(2).  Moreover:

> actual intimidation of a witness is not an essential element of the crime.  The crime is committed if one, with the necessary *mens rea*, "attempts" to intimidate a witness or victim....  The trier of the facts, therefore, could find that [the defendant] attempted to intimidate his accuser and that he did so intending or, at least, having knowledge that his conduct was likely to, impede, impair or interfere with the administration of criminal justice....  The Commonwealth is not required to prove *mens rea* by direct evidence.  Frequently such evidence is not available.  In such cases, the Commonwealth may rely on circumstantial evidence.

*Commonwealth v. Beasley*, 138 A.3d 39, 48 (Pa. Super. 2016) (citation omitted).

Our review of the certified record reflects that Mr. Foris offered the following testimony regarding his meeting with Appellee:

> Q. Now, I want to direct your attention back to the spring months of this past -- of this year, 2015.  During that time period, did you have contact with an individual named Mark Goldman?
>
> A. Yes.
>
> Q. Can you tell us the circumstances under which that occurred?
>
> A. I was asked -- and I can't remember who had called me and asked me -- to speak to him, to try to verify some information that he had.
>
> Q. He being Mark Goldman?
>
> A. Mark Goldman, yeah.
>
> Q. And where was it that you received this phone call?
>
> A. At my house.

Q. That's your house in Trenton?

A. Yes.

Q. Do you remember was it a man or a woman who called you?

A. I can't remember. I really can't remember, but I believe it was a man.

Q. And the man told you that -- what specifically, what did he tell you about Mark Goldman?

A. That he was an investigator for Mrs. Risoldi and that he wanted me to verify some appraisal slips that he had.

Q. What did you say to the -- when the person told you that, what did you say to them?

* * *

A. I said, yes, I would look at it. Yeah.

Q. What happened after that?

A. Mr. Goldman showed up at the house and showed me the photos of the appraisal slips and asked me whether I could verify that that was my signature on those.

* * *

Q. Before I show those, the appraisals that Mr. Goldman brought to you -- now, first of all, where did -- did Mr. Goldman come to your house?

A. Yes.

Q. Was he with anyone or just by himself?

A. He was by himself.

Q. And can you describe the appraisals that Mr. Goldman brought to you?

A. As to what?

Q. You said that he came to your house?

A. He had photostats of appraisal slips for Fairless Hills Auction.

Q. Now, I'm going to show you what's been marked as Exhibit 212.

* * *

Q. Mr. Foris, you're now looking at what's been identified as Commonwealth's Exhibit 212, which is a packet of appraisals that say Fairless Hills Auction on the top?

A. Yes.

* * *

Q. . . . Now, Mr. Foris, you have in front of you Exhibit 212. Do you recognize those documents?

A. They appear to be the ones that he showed me.

Q. He being Mr. Goldman?

A. Correct.

Q. And when he came to your house he identified -- how did he identify himself?

A. He had an identification card as being a private investigator, basically.

Q. It said Mark Goldman on the card?

A. Yes.

* * *

Q. Do you recognize those as the documents that Mr. Goldman showed you?

A. They appear to be the same ones, yes.

Q. And those appraisals appear to have a signature on them, Edward T. Foris?

A. Yes.

Q. Did you prepare those appraisals?

A. No.

Q. Now, tell me what transpired when Mr. Goldman came to your house with those appraisals.

A. Well, he asked me about the appraisals and whether I could verify my signature. I told him that it appeared to be my signature, except for the fact that they all looked identical. And I don't -- I don't think anyone ever signs their name identically one right after the other.

Q. And with respect to the appraisal itself, did you recognize that as an appraisal you would prepare?

A. As one I prepared?

Q. Yes.

A. No, I didn't prepare this.

Q. How can you tell you didn't prepare those appraisals?

A. It's typed. I've never put my signature on a typed appraisal, ever.

Q. Now, what could you tell Mr. Goldman about those appraisals?

A. The same thing that I'm telling you, that, you know, I don't type up appraisals. And I don't have someone type them up and then sign them.

Q. And when you told Mr. Goldman -- when you told Mr. Goldman that, did anything else happen after that, or did he say anything to you?

A. Well, he seemed a little upset about it.

\* \* \*

Q. And backing up to when Mr. Goldman was there, how long was he at your house?

A. Maybe 20 minutes, a half-hour.

Q. And do you recall if he was taking any notes or writing anything down?

A. He was taking notes. I'm trying to remember whether he had recorded anything, but I know he was taking notes.

Q. Did he ask you to sign anything?

A. Not that I can remember.

Q. And when he left, had you asked him to leave, or did he just leave on his own?

A. No, he just left on his own.

N.T., 11/20/15, at 18-25.

This testimony from Mr. Foris, read in the light most favorable to the Commonwealth, does not reflect that, at any point during their meeting at Mr. Foris's residence, Appellee intimidated or attempted to intimidate Mr. Foris into giving any false or misleading information or testimony regarding the appraisals in question. Accordingly, we are constrained to conclude that the Commonwealth has failed to establish a *prima facie* case that Appellee committed the crime of intimidation of a witness.

## OBSTRUCTION OF JUSTICE

Next, the Commonwealth argues that the trial court erred in concluding that it failed to establish a *prima facie* case that Appellee

committed the crime of obstruction of justice. Commonwealth's Brief at 66-67. The Commonwealth offers the following argument in support of its claim:

> It is the Commonwealth's position that under the same reasoning that a *prima facie* case was established for intimidation of witness, this count of obstruction of justice was supported by sufficient evidence to establish a *prima facie* case. [Appellee's] conduct, in conjunction with co-defendant Claire Risoldi's actions, demonstrate an effort to influence the testimony of Edward Foris by use of threats and bribes. Accordingly, the lower court erred by dismissing the charge.

***Id***. at 67.

The Crimes Code defines the crime of obstruction of justice as follows:

> A person commits a misdemeanor of the second degree if he intentionally obstructs, impairs or perverts the administration of law or other governmental function by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.

18 Pa.C.S. § 5101. Our Supreme Court has explained that:

> [i]n order to establish that [a defendant] obstructed the administration of law under section 5101, the Commonwealth must establish that: (1) the defendant had the intent to obstruct the administration of law; and (2) the defendant used force or violence, breached an official duty or committed an unlawful act.

***Commonwealth v. Goodman***, 676 A.2d 234, 235 (Pa. 1996). As we observed in ***Commonwealth v. Snyder***, 60 A.3d 165 (Pa. Super. 2013);

> [i]n evaluating § 5101 convictions, our courts have explained that § 5101 is substantially based upon the Model Penal Code section 242.1. As stated in the comment to section 242.1 of the

Model Penal Code "[t]his provision is designed to cover a broad range of behavior that impedes or defeats the operation of government."

*Id*. at 175 (case citations omitted).

As set forth in the testimony in our review of the charge of intimidation of a witness, it is undisputed that Appellee did not use force or violence or breach an official duty when he met with Mr. Foris regarding the appraisals that bore Mr. Foris's signature. Moreover, as discussed previously in this decision, it is our conclusion that the Commonwealth has not shown that Appellee committed an unlawful act by visiting Mr. Foris and discussing the appraisals. Accordingly, the Commonwealth's contrary claim lacks merit.

CRIMINAL CONSPIRACY TO INTIMIDATE A WITNESS

The Commonwealth last argues that the trial court erred in concluding that it failed to establish a *prima facie* case that Appellee committed the crime of criminal conspiracy to intimidate a witness. Commonwealth's Brief at 67-68. In this regard, the Commonwealth presents the following argument:

> It is the Commonwealth's position that under the same reasoning that a *prima facie* case was established for insurance fraud and the related criminal conspiracy as well as intimidation of witness, this count of obstruction of justice [sic] was supported by sufficient evidence to establish a *prima facie* case. [Appellee's] participation in the overall conspiracy was detailed above and amply established. His efforts to influence Edward Foris were clearly made in conjunction with Claire Risold[i]'s conduct on the heels of [Appellee's] own efforts. It is reasonable to infer that [Appellee] agreed with Risoldi to attempt to coerce [Mr.] Foris into adopting the fabricated appraisals. Accordingly, based on all of the above, it is clear that the Commonwealth

established a *prima facie* case and the lower court erred in dismissing the charge.

*Id*.

We set forth the relevant law pertaining to the crimes of criminal conspiracy and intimidation of a witness above. Therefore, we will not repeat it here.

In support of its claim, the Commonwealth infers that Appellee attempted in influence Mr. Foris and that his efforts to do so were in conjunction with Claire's efforts. However, our thorough review of the record reflects no such evidence. The only evidence that links Appellee's visit with the telephone call and visit from Claire was the following testimony from Mr. Foris:

> A. . . . And right after [Appellee] left, I had gotten a -- I'm trying to remember now how the sequence went. You have to understand, I just recently lost my wife, so I'm a little bit upset here.
>
> I'm trying to remember whether Mrs. Risoldi, or Claire, had called me and asked me to -- I believe she did call me and asked me if I would verify that I had done those, and I told her no.
>
> And she said, well, I want to do something for you. She said, can I send you some money or something. I said, no. And shortly thereafter we received -- my wife and I received at the house some flowers and a fruit basket.
>
> And then shortly after that, I believe it was, not too long after, Mrs. Risoldi showed up at the house and was sort of begging me to say that I had signed these.
>
> Q. When she showed up -- do you know about how long after [Appellee] was there that Mrs. Risoldi showed up?

A. It wasn't too much longer, couldn't have been not a month, I know that.

N.T., 11/20/15, at 24-25.

This evidence lacks a specific connection between Appellee's conduct in visiting Mr. Foris and Claire's conduct in phoning Mr. Foris, sending a fruit basket, and then visiting Mr. Foris's home. Indeed, Mr. Foris was equivocal in the timing of events, and how much time elapsed between Appellee's visit and the contact from Claire. Moreover, the only time frame that Mr. Foris specified for certain was that Claire visited his home "not too much longer" after Appellee's visit to his home. He then specified that the visit "couldn't have been not a month [later]." This ambiguous testimony was not sufficient to establish a *prima facie* case of conspiracy between Appellee and Claire to intimidate a witness. Hence, the Commonwealth's contrary claim lacks merit.

Order affirmed.

Judge Solano joins the Memorandum.

Judge Platt files a Dissenting Statement.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/18/2017

- 43 -